IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FENIX FLASHLIGHTS, LLC,     )
                                       )
          Plaintiff,           )
                                       )
          v.                  )          1:12CV1310
                                       )
JIAN LI, et al.,           )
                                       )
          Defendants.     )
_____ )
                                       )
FENIX FLASHLIGHTS, LLC,     )
                                       )
          Plaintiff,           )
                                       )
          v.                  )          1:15CV140
                                       )
TACBEAM, LLC,          )
                                       )
          Defendant.      )
_____ )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This consolidated proceeding is presently before the Court on Defendants' Motion to Dismiss [Doc. #2] and Plaintiff's Motion to Remand [Doc. #13].[1] In the Motion to Remand, Plaintiff contends that this matter should be remanded to state court for improper removal and lack of federal jurisdiction. In the Motion to Dismiss, Defendants contend that the matter

---

[1] Plaintiff and Defendants originally filed their respective motions in both Fenix I, 1:12CV1310, and Fenix II, 1:15CV140. After the Court consolidated the actions, the Clerk terminated the duplicative Motions as filed in Fenix I. Now pending before the Court are the Motions filed in Fenix II, which fully incorporate the Motions and related briefing filed in Fenix I. Accordingly, the Court will consider all of the contentions raised in Fenix I and Fenix II.

should be dismissed or stayed in favor of arbitration. Also before the Court are Defendants'

Motion to Supplement Record [Doc. #25] and Plaintiff's Motion to Strike [Doc. #27].

For the reasons that follow, the Court will recommend that Plaintiff's Motion to

Remand be denied, that Defendants' Motion to Dismiss also be denied, that Defendants'

Motion to Supplement Record and Plaintiff's Motion to Strike be denied as moot, and that

this matter proceed in this Court.

## I.   FACTS, CLAIMS, AND PROCEDURAL HISTORY

This consolidated case involves claims in Fenix I, 1:12CV1310, and Fenix II,

1:15CV140, all arising out of the same underlying events, relating to an alleged failure to pay

for products ordered, delivered, and accepted. According to the Complaints, in December

2011 and January 2012, Defendants placed three orders with Olight Technology Co., Ltd.

("Olight"), "a manufacturer of specialty flashlights and accessories, with its principal place of

business in Shenzhen, China," for products valued at a total of $199,472.28. (Fenix I, Compl.

[Doc. #3], ¶¶ 18, 26; Fenix II, Compl. [Doc. #8] ¶¶ 20, 28.)[2] The Complaints allege that

Defendants agreed to pay a $40,000 down payment, but requested that Olight ship the

products before payment in full. (Fenix I, Compl. ¶¶ 26-30; Fenix II, Compl. ¶¶ 28-32.)

According to the Complaints, Olight shipped the products as requested, but Defendants never

paid any amount beyond the $40,000 down payment, which, together with a customs fee of

$143.00 and a credit of $831.83 from prior dealings, left an unpaid balance of $158,783.45.

(Fenix I, Compl. ¶¶ 26-40; Fenix II, Compl. ¶¶ 28-42.) Plaintiff Fenix Flashlights ("Plaintiff"),

---

[2] The Complaint in Fenix I refers to "December and January 2011." (Fenix I, Compl. [Doc. #3], ¶ 26 (emphasis added).) Subsequent paragraphs in the Complaint reflect that the appropriate dates are December 2011 and January 2012. (Id. ¶¶ 30, 56, 57 (emphasis added)). The Parties do not dispute the relevant dates, and the Complaint in Fenix II reflects the appropriate dates.

a Georgia limited liability company, is the assignee of Olight's "complete rights pertaining to the products that are the subject of [the] Complaint, including all rights to sums due as described in [the] Complaint." (Fenix I, Compl. ¶¶ 1, 19; Fenix II, Compl. ¶¶ 1, 21.) The Defendants are Jian Li, his alleged partner Borencio Darden, and their business entities Powertac, LLC and Tacbeam, LLC.

Plaintiff filed the Complaint in Fenix I in state court against Jian Li, Borencio Darden, individually and as partners, and Powertac, LLC, alleging claims for (1) Breach of Contract; (2) Breach of the Obligation of Good Faith and the Covenant of Good Faith and Fair Dealing; (3) Fraudulent Inducement; (4) Unfair and Deceptive Trade Practices; and (5) Unjust Enrichment. Upon subsequent representations from the Fenix I Defendants that Tacbeam, LLC ("Tacbeam") should be considered the appropriate Defendant, Plaintiff filed Fenix II "in the alternative" on November 24, 2014, again in state court. In Fenix II, Plaintiff asserts claims against Tacbeam for (1) Breach of Contract; (2) Breach of the Obligation of Good Faith and the Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment; and (4) Piercing the Corporate Veil.[3] Both cases were removed to this Court and were consolidated. In addition, in response to Defendants' contention that claims for fraudulent inducement and unfair trade practices could not be assigned from Olight to Plaintiff, Plaintiff requested voluntary dismissal of those claims, alleged as Counts Three and Four in the Complaint in Fenix I. (Fenix I, Pl.'s Notice of Voluntary Dismissal [Doc. #24].) To the extent any question remains as to the status of those claims, the Court will include in this Memorandum a

---

[3] Plaintiff contends that if the orders were made by Tacbeam, LLC, the corporate veil should be pierced such that Jian Li is personally liable for the amounts owed. Those contentions do not need to be resolved in addressing the present motions, and the Court will refer to all of the individual and corporate entities collectively as "Defendants."

Recommendation that those claims be voluntarily dismissed without prejudice pursuant to Rule 41.

Now before the Court are Defendants' Motion to Dismiss and Plaintiff's Motion to Remand, as well as Defendants' related Motion to Supplement Record and Plaintiff's Motion to Strike. At the heart of these Motions is a dispute regarding whether the transactions at issue in this case are subject to an arbitration agreement contained in a Sales Agency Contract ("Agency Contract") between Olight and "Tacbeam (Jian Li)." That Agency Contract was a distribution agreement that designated "Tacbeam (Jian Li)" as the exclusive distributor of Olight products in certain states. The Agency Contract included a stated effective date from January 15, 2010 to January 15, 2011, and included an arbitration agreement that reads:

> Relevant Chinese laws are applicable to this Contract. Any dispute arise [sic] from the performance of the Contract by both parties shall be arbitrated by China International Economic and Trade Arbitration Commission (Beijing). Both parties agree to use Chinese during arbitration.

(Contract [Doc. #6-3] at 13-15.)[4] Plaintiff does not challenge the validity of the arbitration agreement as to disputes arising while the Agency Contract was in force. However, Plaintiff contends that the arbitration agreement cannot govern the claims in this case because the claims in this case are based on Defendants' failure to pay for products ordered in December 2011 and January 2012, nearly one year after the Agency Contract's express termination date of January 15, 2011. (Pl.'s Resp. [Doc. #6-5] at 4-5.) Plaintiff does not bring any claims in this case for alleged violation of the Agency Contract, and Plaintiff contends that the claims in this case are just simple breach of contract claims for breach of the obligation to pay for

---

[4] Hereinafter, citations will be to Fenix II, unless otherwise noted, and the cited page number will refer to the number assigned by CM/ECF.

purchases made by individual purchase orders in December 2011 and January 2012. In contrast, Defendants argue that despite the Agency Contract's express termination date of January 15, 2011, subsequent communications and conduct between Olight and Jian Li establish an extension of the Agency Contract such that the Agency Contract, and the arbitration provision it contains, governs the instant dispute. (Defs.' Br. [Doc. #6-4] at 9-12.)

In considering the pending Motions, the Court will consider the relevant issues as follows: First, the Court will consider Plaintiff's contention that this action was not properly removed from state court. For the reasons set out below, the Court concludes that removal was proper pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Second, the Court will consider Defendants' contention that this case should be dismissed or stayed in favor of arbitration. As to this issue, the Court ultimately concludes that the request to compel arbitration should be denied, in light of the expiration of the Agency Contract that contained the arbitration agreement. Third, the Court will consider Plaintiff's contention that this case should be remanded for lack of federal jurisdiction. On this issue, the Court concludes that, in light of the complete diversity of the Parties and the amount in controversy, this Court has diversity jurisdiction under 28 U.S.C. § 1332, which continues to provide a basis for jurisdiction in this case even if removal was made pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Fourth, and finally, the Court considers Defendants' contention that Plaintiff's claims should be dismissed because the assignment from Olight to Plaintiff Fenix Flashlights was not effective until after Fenix I was filed. As to this contention, the Court concludes that the assignment was effective on the day that Fenix I was filed, and that Olight is the real party in interest in light of the

5

assignment. Therefore, the Court will recommend that Defendants' Motion to Dismiss or to Compel Arbitration be denied, that Plaintiff's Motion to Remand be denied, and that this matter proceed in this Court.

## II.   PROPRIETY OF REMOVAL FROM STATE COURT

The Court first considers Plaintiff's contention that removal of this action from state court was improper. In considering this contention, the Court notes that Defendants removed both of the underlying cases from state court based upon the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), 9 U.S.C. § 201 et seq. (Fenix I, Corrected Notice of Removal [Doc. #14] at 1; Fenix II, Notice of Removal [Doc. #1] at 1.) The Convention is an international treaty designed "'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.'" Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 366 (4th Cir. 2012) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974)). The Convention was implemented by Congress at Title 9, Chapter 2 of the United States Code, following the Federal Arbitration Act, see 9 U.S.C. §§ 1-14 (Federal Arbitration Act); 9 U.S.C. §§ 201-208 (Convention Act), and grants federal courts jurisdiction to hear actions to enforce an arbitration agreement falling under the Convention, 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.").

Under § 205 of the Convention, removal to federal court is proper "[w]here the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention . . . ." 9 U.S.C. § 205. Section 205 has been characterized as "one of the broadest removal provisions . . . in the statute books." Acosta v. Master Maintenance and Const. Inc., 452 F.3d 373, 377 (5th Cir. 2006). The Fifth Circuit Court of Appeals has described the standard under § 205 as follows:

> [W]henever an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case, the agreement "relates to" [ ] the plaintiff's suit. Thus, the district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case. That is all that is required to meet the low bar of "relates to."

Beiser v. Weyler, 284 F.3d 665, 669 (5th Cir. 2002) (emphasis in original); see also Reid v. Doe Run Res. Corp., 701 F.3d 840, 844 (8th Cir. 2012) (applying the Beiser standard); Infuturia Global Ltd. v. Sequus Pharm., Inc., 631 F.3d 1133, 1137-38 (9th Cir. 2011) (same). All of the federal appellate courts to have considered the issue have concluded that an arbitration agreement falling under the Convention "relates to" the parties' suit where the agreement "could conceivably affect the outcome of the plaintiff's case." Beiser, 284 F.3d at 669; see also Reid, 701 F.3d at 844; Infuturia Global Ltd., 631 F.3d at 1137-38. This standard is in harmony with Congress' intent in enacting § 205 to facilitate "[e]asy removal of actions involving arbitration clauses with foreign nationals . . . ." Pinnoak Res., LLC v. Certain Underwriters at Lloyd's London, 394 F. Supp. 2d 821, 827 (S.D. W. Va. 2005).

Here, the Parties do not dispute that the Agency Contract contained an arbitration agreement falling under the Convention. (Contract [Doc. #6-3] at 13-15.) Instead, the Parties

dispute whether that Agency Contract was still in force such that it governed the transactions at issue in this case. Plaintiff contends that because Defendants have not established that there is an "arbitration agreement *applicable* to the transactions at issue," removal under the Convention was improper. (Pl.'s Br. [Doc. #14-1] at 5-12 (emphasis added).) In response, Defendants contend that the Agency Contract was still in force and that the arbitration agreement included in that Agency Contract applies to the instant dispute. (Defs.' Resp. [Doc. #19-5] at 7-10.)

Having considered these contentions, the Court notes that if Defendants were to prevail on their argument that the Agency Contract was extended, then the arbitration agreement, which Plaintiff does not dispute falls under the Convention, would be directly implicated. Defendants' contention that the arbitration provision of the Agency Contract relates to Plaintiff's claims is certainly not "absurd or impossible." Beiser, 284 F.3d at 669. Because it is at least conceivable that the arbitration agreement in the Agency Contract could impact the outcome of this case, removal was proper under § 205, and this Court may decide whether this action should be referred to arbitration.[5]

III.     MOTION TO COMPEL ARBITRATION

Following the removal of this matter from state court, Defendants filed the pending Motion to compel arbitration of all of Plaintiff's claims. A party seeking to compel arbitration under the Convention must establish that:

---

[5] The Court notes that Plaintiff also argues that Defendant Tacbeam's Notice of Removal in Fenix II was untimely because it was not filed within 30 days of service of the Complaint, as required by 28 U.S.C. § 1446(b). (Pl.'s Br. [Doc. #14] at 2.) However, Defendants argue, and Plaintiff does not dispute in its Reply, that removal was timely under the Convention, 9 U.S.C. § 205, which permits a party to remove an action "at any time before [] trial . . . ." Accordingly, the notice of removal was not untimely.

> "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states."

Aggarao, 675 F.3d at 366 (quoting Balen v. Holland Am. Line Inc., 583 F.3d 647, 654-55 (9th Cir. 2009)). "When these jurisdictional prerequisites have been satisfied, a district court is obliged to order arbitration unless it finds that the [arbitration] agreement is null and void, inoperative or incapable of being performed." Id. at 366-67 (internal quotation omitted).

In this case, with respect to these jurisdictional prerequisites, the only dispute is whether there is a written agreement to arbitrate that is still operative and that applies to the claims in this case. As noted above, Plaintiff argues that because the Agency Contract which contained the arbitration agreement expired by its own terms on January 15, 2011, the arbitration agreement cannot govern the transactions at issue in this case, which involve later product purchases in December 2011 and January 2012. In response, Defendants argue that despite the Agency Contract's express termination date, the arbitration agreement governs the instant dispute because the parties impliedly extended the Agency Contract by their ongoing business relationship.

"Courts favor arbitration and interpret arbitration provisions broadly, especially in the international context. However, a party cannot be required to arbitrate a dispute that it has not agreed to submit to arbitration." Fastener Corp. of Am. v. Asheboro Elastics Corp., No. 1:12-CV-1296, 2013 WL 3227665, at *2 (M.D.N.C. June 25, 2013) (internal citation omitted). "Arbitrability disputes often necessitate a two-step inquiry. First, we determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if we conclude

9

that the court is the proper forum in which to adjudicate arbitrability, we then decide *whether* the dispute is, in fact, arbitrable." Peabody Holding Co., LLC v. United Mine Workers, 665 F.3d 96, 101 (4th Cir. 2012) (emphasis in original) (internal citation omitted). As to the first step, "the question of arbitrability . . . is undeniably an issue for judicial determination," unless the parties "clearly and unmistakably" provide otherwise. AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) (internal citation omitted); see also Dell Webb Communities, Inc. v. Carlson, __ F.3d __, 2016 WL 1178829, at *6 (4th Cir. 2016); Virginia Carolina Tools, Inc. v. Int'l Tool Supply, 984 F.2d 113, 117 (4th Cir. 1993). Here, nothing in the arbitration agreement manifests a clear and unmistakable intent to submit the question of arbitrability to the arbitrator, and Defendants do not argue otherwise. Accordingly, the Court should decide the question of arbitrability.

However, Defendants nevertheless contend that the dispute in this case over the Agency Contract's duration must be submitted to the arbitrator, and that the arbitrator, not the Court, should resolve that threshold durational dispute. (Defs.' Br. [Doc. #6-4] at 6.) In Virginia Carolina Tools, the Fourth Circuit described the appropriate analysis for such durational disputes:

> The question whether a dispute over an agreement's duration is for court or arbitrator theoretically can be approached in two basic ways. It could be thought properly to turn on whether the agreement itself has expired. For if it has, the obligation to arbitrate any dispute arising under it has also expired, since the obligation's source is the agreement's arbitration clause. But to take this approach obviously requires deciding, or coming close to deciding, the very issue of the agreement's duration whose arbitrability is in issue. For good reason, this circular approach has been rejected as one that necessarily compromises decision on the very matter in dispute in the course of deciding who shall decide it. *AT & T Technologies*, 475 U.S. at 649, 106 S. Ct. at 1418.

The other approach—and the proper one—treats the question as one simply of contract interpretation. It asks directly "whether the parties, at the time they entered into the contract, intended that disputes over the duration of the contract would be decided by a court or the arbitrators." *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760 (D.C. Cir. 1988). This gets directly at the matter, simply applying the fundamental principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers*, 363 U.S. at 582, 80 S. Ct. at 1353. And it does so by a process that avoids the problems of circularity and compromise of the decisional process that make the first approach unacceptable.

Virginia Carolina Tools, 984 F.2d at 118. In undertaking this contract interpretation analysis, the Fourth Circuit in Virginia Carolina Tools focused on two issues. First, the court noted that the contract at issue in that case included a broad but "non-specific" arbitration clause that did not expressly indicate an intent to submit durational disputes to the arbitrator. Id. Second, the court noted that the contract included an express termination date provision, and thus "no built-in likelihood of dispute over its duration." Id. Based on these considerations, the Fourth Circuit concluded that:

> Taking into account the implications of a broad, non-specific arbitration clause in combination with an express termination date provision, and according proper weight to the general presumption in favor of arbitration when applied to a dispute over the very continuation of contractual obligations, we conclude that an intent to commit that issue to arbitration cannot properly be inferred from this agreement. *See National R.R.*, 850 F.2d at 763 ("[I]f a contract provides that 'all disputes between the parties shall be arbitrated,' but with equal clarity provides that it will expire on a date certain, then any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator.").

Id.[6]; see also Nat'l R.R. Passenger Corp. v. Boston and Maine Corp., 850 F.2d 756, 762-63 (D.C. Cir. 1988) (resolving similar durational dispute by considering whether the agreement

---

[6] The Court notes Defendants' contention that, because the Parties here dispute whether the Agency Contract was extended, Virginia Carolina Tools is inapplicable, as there the agreement's termination was undisputed. (Defs.' Br. [Doc. #6-4] at 9.) However, in Virginia Carolina Tools, like here, the parties did not dispute that

included a "broad" or "narrow" arbitration clause, and concluding that even if the agreement included a "broad" arbitration clause that would raise a presumption in favor of arbitration of the durational dispute, that presumption was overcome by inclusion of an express termination date, such that "any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator"); see also Dist. No. 1, Pac. Coast Dist. v. Liberty Maritime Corp., __ F.3d __ , 2016 WL 761005, at *9 (D.C. Cir. 2016) (noting that "if the arbitration provision is narrow, and thus does not appear to cover duration, the court determines whether the contract remained in effect;" if the arbitration provision is broad, the court presumes that the arbitrator should decide the durational dispute, but that presumption is overcome if the agreement provides a clear, fixed expiration date).

Defendants nevertheless contend that if there is any ambiguity with respect to the Agency Contract's duration or renewal, the general presumption in favor of arbitration requires that the matter be resolved by the arbitrator under the Fourth Circuit's more recent decision in Peabody. However, in Peabody, the Fourth Circuit reconciled the relevant standards as follows:

> When interpreting a contract containing an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.
> ….
> To be sure, courts will not blindly apply the presumption in favor of arbitrability, overlooking crucial nuances of the dispute before them. We must carefully consider any claims that the agreement—including its arbitration clause—was not executed properly. Indeed, where the dispute at issue concerns contract formation, the dispute is generally for courts to decide. Thus where a

the contract provision at issue expired by its terms, but rather disputed whether it had been extended orally or by the parties' conduct. Accordingly, the Fourth Circuit's reasoning in Virginia Carolina Tools is applicable to this case.

contract commits to arbitration those matters "arising under" the agreement, we may not submit questions of contract formation to the arbitrator, as those questions cannot "arise under" an agreement that was never validly formed. . . .

We have similarly held that, in a narrow class of cases, courts—not arbitrators—must decide questions of contract duration. *Va. Carolina Tools*, 984 F.2d at 115–118. In *Virginia Carolina Tools*, we confronted a dispute involving an option agreement containing an arbitration clause covering "any dispute aris[ing] between the parties." *Id.* at 115. The parties agreed that the option provision as written had expired before the claim at issue arose, but they disagreed as to whether subsequent oral discussions constituted a new option agreement. *Id.* In that case, we thought "it proper to accord [the presumption in favor of arbitrability] less force in respect of contract duration issues than is appropriate in respect of disputes arising under a contract whose own continuation is unchallenged." *Id.* at 118. A critical element of the dispute convinced us that the matter was not arbitrable. The contract included an express termination-date provision, which the parties agreed extinguished the obligations under the contract—at least as written. *Id.* As a result of the clear durational limitation enshrined in the contract, we concluded that there was "no incipient issue of contract duration in the parties' memorialized agreement, hence no built-in likelihood of dispute over its duration."

Peabody, 665 F.3d at 104-05 (internal quotations and citations omitted) (alteration in original). In Peabody, the Fourth Circuit concluded that the durational dispute in that case did not involve an express termination-date provision, but instead required the court to "interpret other language in [the contract] as compelling termination of the contract . . . ." Id. at 106. Thus, that case involved a determination that was "more akin to an intricate interpretational question presumed to have been committed to the arbitrator." Id.; see also Spectrum Healthcare Res., Inc. v. InGenesis Arora Military, LLC, No. 1:12-cv-645, 2012 WL 4461287, at *5 (E.D. Va. Sept. 24, 2012) ("In sharp contrast to the dispute in Virginia Carolina Tools, the dispute in Peabody Holding Co. concerning the [agreement] between the parties did not involve the application of a fixed termination date; instead, the dispute in that case focused on whether the [agreement] was still operative for the remaining Peabody entities when the

13

signing entity had been sold."). However, Peabody also expressly reaffirmed the principle that courts, not arbitrators, should decide questions of contract duration in some circumstances, including where the arbitration agreement is included within a contract that also contains an express termination date provision that extinguished the agreement, at least as written. Peabody, 665 F.3d at 106; see also Litton Fin. Printing Div. v. Nat'l Labor Relations Bd., 501 U.S. 190, 209 (1991); Virginia Carolina Tools, 984 F.2d at 118-19; Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc., 307 F.3d 601, 604 (7th Cir. 2002); Fastener Corp., 2013 WL 3227665, at *3 ("It is well-established that when a contract terminates by its own terms and the dispute between the parties did not arise out of that contract, then the arbitration clause in that contract does not come into play.").

In the present case, beginning first with the language of the arbitration clause itself, the Court notes that the arbitration provision requires arbitration of disputes "aris[ing] from the performance of the Contract." (Contract [Doc. #6-3] at 15.) However, nothing in this language indicates an intent to submit durational disputes to an arbitrator. Indeed, the language is narrower than the arbitration provision considered in Virginia Carolina Tools, which called for arbitration for "any dispute aris[ing] between the parties." 984 F.2d at 115. Thus, the non-specific language of the arbitration clause in the present case does not reflect an intent for the arbitrator to resolve issues of contract termination and renewal. Moreover, the Agency Contract specifically provides that "[t]he validity period of the Contract is 1 year, (from January 15, 2010 to January 15, 2011.)" (Contract [Doc. #6-3] at 15.) Thus, the Agency Contract includes a fixed term, with a termination date of January 15, 2011, and it is undisputed that the parties to the Agency Contract never executed a written agreement to extend the

expiration date.  Although Defendants contend that the Agency Contract was impliedly extended, these contentions do not raise intricate interpretational questions.  In the circumstances, under the standards set out above, there is no basis to conclude that the parties to the Agency Contract intended that the type of durational dispute presented here would be for the arbitrator to resolve.  The Agency Contract includes a relatively narrow, non-specific arbitration provision, and even if the provision were construed as a broad arbitration provision, any presumption in favor of arbitrability of the durational dispute is overcome by the inclusion of the definitive expiration date in the written agreement.  It therefore appears that the durational dispute is for the Court to resolve.[7]

In considering that durational dispute, the Court notes first that it is undisputed that there is no formal, written agreement for 2011.  Defendants nevertheless contend that the transactions in December 2011 and January 2012 are subject to arbitration because the parties continued to do business as if the Agency Contract were still in place.  In addressing this issue, the Court will first set out the information in the record related to the Agency Contract and the parties' dealings in 2011.[8]

---

[7] In support of their position, Defendants cite Nitro-Lift Tech, L.L.C. v. Howard, 133 S. Ct. 500 (2012), holding that "when parties commit to arbitrate contractual disputes, . . . attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved 'by the arbitrator in the first instance, not by a federal or state court.'"  133 S. Ct. at 503 (quoting Preston v. Ferrer, 552 U.S. 346, 349 (2008)).  However, unlike in Nitro-Lift, the question here does not involve a challenge to the validity of the contract, and Nitro-Lift does not affect the Court's determination in this case.

[8] Defendants seek to dismiss the case for lack of venue, or, in the alternative, to compel arbitration, based on "[t]he contract's mandatory choices of arbitration, law, and venue . . . ."  (Defs.' Br. [Doc. #6-4] at 3.)  The Court may properly consider evidence outside the pleadings on a Motion to Dismiss for Lack of Venue or a Motion to Compel Arbitration.  See Aggarao, 675 F.3d at 365-66; Swanson v. Prof'l Serv. Indus., Inc., No. 2:11-CV-2880-RMG-BM, 2012 WL 1130664, at *2 (D.S.C. Jan. 4, 2012) report and recommendation adopted, No. CIV.A. 2:11-2880, 2012 WL 1130675 (D.S.C. Apr. 4, 2012).

The Agency Contract includes the following relevant provisions:

Article 12: Change and Dissolution of Contract
For any unsettled matters of the Contract, both parties shall sign supplementary agreements after negotiation. The supplementary agreements are considered parts of the Contract. If Party B partially or fully violates the clauses of the Contract, Party A can dissolve the Contract at any time.
….
Article 14: Contract Term
The validity period of the Contract is 1 year, (from <u>January 15, 2010</u> to <u>January 15, 2011</u>.) If Party B can achieve the specified sales goals within the contract term and does not breach the Contract, it has the priority to signing the next stage of contract under the same conditions.

(Contract [Doc. #6-3] at 15 (emphasis in original).)[9] There is no dispute that no supplementary agreements or extensions were signed. It is also undisputed that Tacbeam did not meet the Agency Contract sales goals for 2010 (Fan Decl. [Doc. #11-3] ¶¶ 7-9), and no contract was signed for the "next stage."

On January 12, 2011, three days before the Agency Contract was set to expire, Christina Wang, an Olight employee, sent an e-mail to Jian Li ("Li"), the sole member of Tacbeam, (Notice of Tacbeam [Doc. #23] at 1), stating that:

I promised you that we will renew the contract with you in 2011, but we must know our distributor's main activities and related marketings before we continue the new contract. Now we know nothing except your sales volume.

(Chow Decl. [Doc. #6-3] at 89 (P-027).) There is no further evidence of any additional negotiations or discussions in January 2011, and it is undisputed that no new contract was signed. However, Defendants contend that the parties thereafter continued transacting business under the terms of the 2010 Agency Contract. (Defs.' Br. [Doc. # 6-4] at 9-12.) For

---

[9] The Court notes that the original Agency Contract was negotiated, written, and signed in Chinese. The Parties have provided the Court with a translated copy. The Court further notes that all email communications cited below relating to the subsequent negotiations and transactions were written in English.

example, Tacbeam placed orders with Olight in April 2011 and July 2011, and in those transactions, Olight continued to credit Tacbeam with rebates and continued to use the previous quarterly sales targets. (Li Decl. [Doc. #6-3] at 5-6 ¶¶ 14-21.) In addition, Olight continued to set minimum advertised prices for its products, and reimbursed Tacbeam for warranty and support costs, all of which the Agency Contract obligated Olight to do. (Id.) However, Plaintiff contends that an exclusive distributorship agreement did not need to be in place in order for Olight to continue to sell products to Tacbeam, and Plaintiff presents evidence that Olight sold its products to some distributors, with rebates and reimbursements, without requiring or entering any Agency Contract. (Kim Decl. [Doc. #13-13] at 2; Fan Decl. [Doc. #11-3] ¶ 16.)

E-mail communications reflect that eight months after the stated expiration date, in September 2011, Olight and Tacbeam began to actively negotiate the terms under which to renew the Agency Contract, focusing on the terms related to Tacbeam's exclusive distribution territory. (Chow Decl. [Doc. #6-3] at 106-28, 138-42 (P-044 – P-065, P-075 – P-079)).) In a September 2011 email to Li, Olight set out the proposed terms, including an increased sales target, and also noted that:

> -you requested contract to start at the end of the year so that the 20% increase doesn't start until then – **however, until the contract is signed you do not have any exclusivity at all and are exposed to risk**
> -contract starts only when an agreement is signed so you can't have a signed agreement and delay the 20% increase requirement.

(Id. at 108 (P-046) (emphasis added).) In response, Li sent an e-mail addressing the proposals and stated that:

> I would like to keep the current contract as it is for the rest of this year, the new contract starts next year, even we may not sign a separate contract for the

remaining part of this year, we will do just what we did for the past 9 months of this year, there are only 3 months left.

(Id. at 112 (P-050).)   Thus, Li suggested that even if no contract was signed for 2011, they could continue operating under the "current contract" for the rest of the year, as they had for the past 9 months.  After receiving that e-mail, several Olight employees exchanged internal e-mails regarding the proposals.[10]  Subsequently, on October 24, 2011, Olight sent an email to Li stating:

> **Your contract was made years ago and expired for long time, now we made a new one.** We believe David has already sent you the new contract at the beginning of Oct, but we don't get any response from your side, which delayed our work too long . . . .

(Id. at 141(P-78) (emphasis added).)  Li responded on October 29, 2011, stating that he "never received the contract from David[,]" but did not address or dispute Olight's contention that the previous Agency Contract had expired.  (Id. at 138 (P-075).)  A draft version of the new agreement was sent on October 29, 2011, which contemplated that the new contract would

---

[10] In an internal e-mail, Olight employee David Chow noted:
> **There is no "current contract" that is very clear – his contract expired**.  He wants to have a contract for protection yet he doesn't want the 25% sales increase requirement.  He can't have both.  (Chow Decl. [Doc. #6-3] at 116 (P-054) (emphasis added).)

In response, Olight employee Christina Want wrote:
> We could give him a period to work on the contract.  We need to sign the contract as soon as possible and **it can not be talked for more than half a year and still hasn't the final result**.  We give him a period to think over the contract if he still delay that, we might need to take action and develop other distributors as well.  (Id. at 120 (P-057).)

In a subsequent internal Olight e-mail, Chow further noted:
> . . . [W]e should sign as soon as possible – it should not be dragged on.  The reason Jian wants to sign at the end of the year is to delay the 25% sales requirement increase.  I reasoned with him- why would he not want the increase of sale[s] from [the] 4th quarter to be part of the increase – of all quarters this is the easiest quarter – but he insisted.  **Then I told him that in truth he has no contract right now and he's at risk and that we should sign soon**.  (Id. (emphasis added).)

These internal emails reflect that Olight did not consider the Agency Contract to have been extended, that they communicated this to Li, and that, in their view, the contract negotiation had "dragged on" for more than half a year with no result.

be in effect from October 1, 2011 to September 30, 2012.  (Id. at 137 (P-074).)  Li responded

on October 31, 2011, asking "what is the feedback on my requests I sent you [a] long time ago

regarding the contract?"  (Id. at 162 (P-100).)  Olight responded by e-mail messages on

November 8, November 9, and November 17, 2011, asking Li to call back.  (Id.)  Li

subsequently responded in an e-mail on November 17, 2011, asking if they could wait to sign

the new contract when they would be together at a trade show in January 2012.  (Id.)  However,

Li again did not contest Olight's contention that the prior Agency Contract had expired.  The

parties never signed the new contract.  (Fan Decl. [Doc. #11-3] ¶¶ 13-14.)  Subsequently, in

December 2011 and January 2012, Tacbeam submitted purchase orders initiating the

transactions that are the subject of the present dispute.

      Defendants contend that an agreement to extend the Agency Contract beyond its

expiration date can be implied from the parties' communications and conduct.  However, in

considering this argument, the Court notes first that multiple courts have concluded that an

ongoing business relationship alone does not imply an extension of an arbitration agreement

contained in an expired contract, and further that any implied extension would not satisfy the

requirement that the arbitration agreement be in writing.  See Nissan N. Am., Inc. v. Jim

M'Lady Oldsmobile, Inc., 486 F.3d 989, 995, 997 (7th Cir. 2007) ("[A]fter the expiration of

[the prior agreement], Nissan continued to provide cars and trucks to M'Lady and M'Lady

continued to sell those products while using the Nissan name in the dealership.  Even if we

assume that a contractual relationship can be implied from that conduct, there is no indication

in any of the uncontested evidence that either party agreed to extend the agreement to arbitrate

beyond the expiration date of [the prior agreement,]" and even if some agreement could be

implied, "[t]he salient fact is there is no evidence of a written agreement to arbitrate that survived the expiration" of the agreement); Signature Tech. Solutions v. Incapsulate, LLC, 58 F. Supp. 3d 72, 83 (D.D.C. 2014) ("The mere continuation of the working relationship between Signature and Incapsulate does not demonstrate the existence of an agreement to arbitrate disputes arising [after the expiration of the parties' agreement]. Parties to a contract have it within their power to specify the date and hour at which their obligation to arbitrate is to end and where they have done so, there is nothing fairly arguable to refer to arbitration." (internal quotation omitted)); LWR Time, Ltd. v. Fortis Watches, Ltd, No. 3:10CV1923, 2012 WL 2905187 at *3, 7 (M.D. Pa. July 16, 2012) (rejecting the contention that an agreement with an expiration date remains binding with regard to the arbitration provision "where the parties to the contract continue to perform as if the initial written agreement remains in full force and effect," and concluding instead that the arbitration agreement must be in writing and that it expired on the termination of the written contract; therefore the arbitration provision could not be invoked "to compel arbitration of Plaintiff's claims that Plaintiff alleges arise from conduct that occurred following the termination of the Written Contract, and which are not founded on rights that occurred or vested under the terminated Written Contract"); O'Hare Accommodations, Inc. v. Aaron Corp., No. 09 C 6644, 2010 WL 2106650, at *4 (N.D. Ill. May 25, 2010) (dismissing the defendant's argument that "the contract was extended through mutual agreement of the parties as evidenced by their continued performance under the contract" and stating that "because [the defendant] cannot point to any effective written agreement that requires arbitration, its motion must be denied. Although the parties' conduct demonstrates that they wished to pursue an ongoing relationship after [the expiration of the

agreement], there is no written indication that the parties elected arbitration to govern any disputes arising out of that post-termination relationship." (internal quotation omitted)); Bogen Commc'ns, Inc. v. Tri-Signal Integration, Inc., No. Civ. 04-6275(WGB), 2006 WL 469963, at *4 (D.N.J. Feb. 27, 2006) ("[The plaintiff] urges the Court to ignore the absence of an automatic extension clause because 'the parties continued to conduct business substantially in accordance with the provision of the Agreement beyond the termination date.' . . . [T]he Court cannot disregard this central issue for it would be assuming that the parties contracted to arbitrate. The fact that [the plaintiff and the defendant] continued their business relationship does not mean that the same rights and obligations under the expired contract persisted."). In this case, the written agreement to arbitrate expired, at least as written, on January 15, 2011. Therefore, under the cases cited above, Defendants' contentions of an implied extension of the Agency Contract by ongoing business dealings would be insufficient to establish either an extension of the agreement to arbitrate or the existence of a written agreement to arbitrate disputes for transactions occurring after the Agency Contract's express termination date.

Moreover, even if an arbitration agreement could be effectively extended by implication, the Court further finds that there is insufficient evidence in this case to support a finding that the Agency Contract was extended by implication at the time of the transactions in December 2011 and January 2012.[11] In this regard, the Court notes that the e-mails in

---

[11] In making this determination, the Court notes there may be some question with respect to choice of law. The Agency Contract states that "[r]elevant Chinese laws are applicable to this Contract," (Contract [Doc. #6-3] at 15), and Defendants contend that Chinese law governs "whether the extension was valid[,]" (Defs.' Reply [Doc. #6-6] at 6). However, Defendants have failed to provide the substance of that law or otherwise comply with the requirements of Federal Rule of Civil Procedure 44.1. See Baker v. Booz Allen Hamilton, Inc., 358 F. App'x 476, 481 (4th Cir. 2009) (noting that a "party claiming foreign law applies carries both the burden of

September and October 2011 from Olight to Li expressly communicated that Olight was not operating under the terms of the expired Agency Contract. Responding to the emails, Li requested that the terms of the "current contract" continue to apply without a written agreement for the remainder of the year, but Olight rejected that request and again stated that the prior Agency Contract had expired. Thus, following Olight's September and October 2011 communications, which affirmatively stated that the prior Agency Contract had expired, there can be no genuine dispute that the parties were not in agreement regarding the expired Agency Contract's application to future transactions.[12] In sum, there is no evidence to support a finding that the parties had agreed to operate under the terms of the expired Agency Contract when the disputed transactions occurred in December 2011 and January 2012.

---

raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case."). If a party fails to provide the requisite information, or fails to articulate how the foreign law differs from the law of the forum state, the Court may apply the law of the forum state. Id. Here, the Court concludes in any event that Defendants' position is factually unsupported, whether under North Carolina law or under the limited Chinese law presented by Defendants, and the Court need not further address the choice-of-law issue.

[12] Defendants also rely on an Olight employee's statement made in an email three days before the Agency Contract's stated expiration of January 15, 2011, that "I promised you that we will renew the contract with you in 2011." (Defs.' Reply [Doc. #6-6] at 4.) Defendants characterize that statement as "confirm[ation] that the contract was being extended." (Id.) However, that statement, placed it its full context, establishes that Olight was, as of January 12, 2011, only requesting more information before making a decision regarding any further agreements: "I promised you that we will renew the contract with you in 2011, but we must know our distributor's main activities and related marketings before we can continue the new contract." (Chow Decl. [Doc. #6-3] at 89 (P-027).) This does not provide evidence that the Agency Contract was being extended or indicate the terms of such extension, nor does it reflect a meeting of the minds regarding an extension. Moreover, as noted above, no written extension was ever executed, and later emails reveal that the parties continued to discuss terms of a new agreement in 2011, with negotiations primarily focused on the scope of Tacbeam's exclusive distribution territory. See Signature Tech. Solutions, 58 F. Supp. 3d at 84 ("The Court finds no basis . . . to assume that the continuation of [the parties'] working relationship manifests their intent to operate under the same terms as the 2010 Agreement. . . . In fact, prior to terminating their business relationship in late 2011, it appears that [the parties] were engaged in negotiations over the terms of an agreement for work performed in 2011, indicating that the parties did not intend to operate under the terms of the 2010 Agreement.").

Similarly, to the extent that Defendants contend that Plaintiff should be equitably estopped from denying the applicability of the Agency Contract to the present dispute, that contention is likewise unavailing. (Defs.' Br. [Doc. #6-4] at 12-14.) As discussed in detail above, the Agency Contract included an express termination provision, and Olight made multiple communications to Tacbeam in September and October 2011 stating that the prior Agency Contract had expired. In the circumstances, any assertions that Olight allowed or misled Tacbeam to believe the Agency Contract was still in effect in December 2011 and January 2012 are factually unsupported and without basis.

As a final matter, the Court also concludes that the draft proposed agreement, referenced in the October 24, 2011 email from Olight to Tacbeam, would not suffice to provide the requisite written agreement to arbitrate. As to that proposed agreement, that agreement was never executed, and there is no evidence of conduct indicating an intent to be bound by the proposal. Plaintiff has provided a declaration that the negotiations regarding that proposed agreement ended in October or November of 2011 – prior to the transactions at issue. (Fan Decl. [Doc. #11-3] ¶ 13.) Defendants do not contend that the new contract was ever in effect, and the proposed agreement explicitly provides that it takes effect only "after authorized signature," (Chow Decl. [Doc. #6-3] at 137 (P-074)), further negating an inference that the parties intended to be bound by the proposed agreement's terms. Accordingly, the parties' draft agreement does not provide a basis for compelling arbitration of the instant dispute.

The Court notes that Defendants have additionally filed a Motion to Supplement Record, intending to submit a declaration of On Lu ("Lu"), Defendants' attorney, and an

exhibit thereto purporting to be an admission made by Plaintiff in a public internet forum. Plaintiff filed a Response in Opposition, as well as a Motion to Strike portions of Lu's declaration. Plaintiff argues that Defendants have offered no basis for the admissibility of the new evidence they wish to introduce. The new evidence appears to show David Chow, the sole member of Plaintiff Fenix Flashlights, stating that "beginning 2012 Jian/Powertac/Borencio started their own brand –in fact this was started months ago, in breach of their Olight distributorship contract." (Defs.' Mot. [Doc. #25] at 23.) Defendants argue that because David Chow accused Defendants of violating the exclusive distributorship provisions of the Agency Contract, "Plaintiff concedes that the Contract did in fact exist at or around the beginning of 2012." (Id. at 7.) Even assuming that this evidence may be properly considered, it would not alter the Court's conclusion that no written arbitration agreement applies to the instant dispute, and that there is no evidence to imply that the Agency Contract was in effect after October 2011, in light of the communications set out above. Accordingly, the Court will deny Defendants' Motion to Supplement Record as moot, which, in turn, renders moot Plaintiff's Motion to Strike.

IV.    PLAINTIFF'S MOTION TO REMAND FOR LACK OF JURISDICTION

In light of this determination, the Court must consider whether any basis for federal jurisdiction remains. As discussed above, this action was removed under 9 U.S.C. § 205. However, having concluded that the claims are not arbitrable, there is a question whether the Convention provides this Court with jurisdiction over Plaintiff's remaining state-law claims. See, e.g. Beiser, 284 F.3d at 675 ("The arbitrability of a dispute will ordinarily be the first issue the district court decides after removal under § 205. If the district court decides that the

24

arbitration clause does not provide a defense, and no other grounds for federal jurisdiction exist, the court must ordinarily remand the case back to state court."). The Court, however, need not decide whether the Convention continues to vest the Court with jurisdiction over the instant dispute, because the Court may properly exercise its diversity jurisdiction. Diversity jurisdiction exists where the amount in controversy exceeds $75,000 and where the dispute is between citizens of different states. 28 U.S.C. § 1332(a). For a court to properly assert diversity jurisdiction, there must be "complete diversity," meaning that "no party shares common citizenship with any party on the other side." Mayes v. Rapoport, 198 F.3d 457, 461 (4th Cir. 1999). Here, Plaintiff seeks damages of more than $150,000, (Compl. [Doc. #8] at 10), and there is complete diversity of citizenship between the Parties. On Plaintiff's side, David Chow, the sole member of Plaintiff Fenix Flashlights, is a citizen of the State of Georgia. (Fenix I, Notice of Fenix Flashlights [Doc. #63] at 1.) On the Defendants' side, Jian Li, the sole member of Defendant Tacbeam, is a citizen of North Carolina, (Notice of Tacbeam [Doc. #23] at 1), and Borencio Darden, the sole member of Defendant PowerTac, was a citizen of North Carolina when Fenix I was filed and removed, and is presently a citizen of California, (Fenix I, Notice of PowerTac [Doc. #64] at 1). Accordingly, the Court possesses diversity jurisdiction over this matter.

Plaintiff contends that the Court lacks jurisdiction under 28 U.S.C. § 1441(b)(2) ("the forum defendant rule"). (Pl.'s Br. [Doc. #14-1] at 18.) Under the forum defendant rule, actions removable solely on the basis of diversity jurisdiction "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. 1441(b)(2). This rule reflects the belief that "there is less

reason to fear state court prejudice against the defendants if one or more of them is from the forum state." Ada Liss Grp. v. Sara Lee Branded Apparel, No. 1:06CV610, 2007 WL 634083, at *2 (M.D.N.C. Feb. 26, 2007) (citing Erwin Chemerinsky, Federal Jurisdiction, § 5.5, at 345 (4th ed. 2003)). Plaintiff argues that because Defendants are North Carolina citizens, and because they removed the case from North Carolina state court, "[p]ursuant to Section [1]441, there is no diversity jurisdiction." (Pl.'s Br. [Doc. #14-1] at 18.)

However, the forum defendant rule does not affect the Court's subject matter jurisdiction. As a court in this District has noted, "[a] majority of circuit courts have held that the forum defendant rule is merely procedural, as opposed to jurisdictional . . . ." Ada Liss Grp., 2007 WL 634083, at *3. Although the Fourth Circuit has not addressed this precise question, "it appears that if faced with the issue . . . [it] would join the majority of circuit courts in holding that the forum defendant rule is merely procedural . . . ." Id. at *4; see also USA Trouser, S.A. de C.V. v. Int'l Legwear Grp., Inc., Civil No. 1:11-cv-00244-MR-DLH, 2015 WL 6473252, at *3 (W.D.N.C. Oct. 27, 2015); Ross v. Mayor & City Council of Baltimore, No. CIV.A. ELH-14-369, 2014 WL 2860580, at *7 (D. Md. June 20, 2014) (noting that the forum defendant rule is "widely regarded as procedural, rather than jurisdictional."). Thus, a defect under the removal statute does not divest a court of jurisdiction. Cf. Doe v. Blair, No. 15-1211, 2016 WL 1084803, at *4 (4th Cir. Mar. 21, 2016) (finding that corporation's failure to allege its principal place of business in the notice of removal was a procedural defect and thus did not divest the district court of jurisdiction).

The question the Court now confronts is whether it must remand this action based on the forum defendant rule where Defendants removed the case under the Convention, "based

on a non-diversity ground of original jurisdiction that has fallen out of the case." In re Repository Techs., Inc., 601 F.3d 710, 722 (7th Cir. 2010). The Court finds no basis for remanding this case based on improper removal, as Defendants properly effectuated removal under the Convention, 9 U.S.C. § 205. See Infuturia Global Ltd. v. Sequus Pharm., Inc., 631 F.3d 1133, 1137 (9th Cir. 2011) (noting that when removal is proper under 9 U.S.C. § 205, "the traditional diversity removal provisions of 28 U.S.C. § 1441 do not apply"). Although the Court has concluded that the claims in this case are not subject to arbitration under the Convention, the fact remains that this action was properly removed thereunder, and subject matter jurisdiction unquestionably still exists, based on diversity jurisdiction. See id. at 1136-37 (relying on the court's diversity jurisdiction in a case properly removed under the Convention, despite the fact that the case could not have been properly removed based on diversity jurisdiction); Grynberg Prod. Corp. v. British Gas, P.L.C., 149 F.R.D. 135, 138 (E.D. Tex. 1993) (addressing a motion for discretionary remand and stating that "[i]f a case has been properly removed on grounds which supersede an otherwise effective bar to removal, a district court need not remand the case when the superseding ground is excised from the case, as long as there is an independent basis for subject matter jurisdiction."); see also Williams v. M/V Sonora, 985 F.2d 808, 812 (5th Cir. 1993).[13]

---

[13] Moreover, a federal court in possession of jurisdiction must exercise that jurisdiction. See Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 817 (1976) (noting the federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them."). As such, some courts have concluded that a district court may be *required* to retain jurisdiction in the circumstances presently confronting the Court. See Grynberg Prod. Corp., 149 F.R.D. at 138 (noting that if complete diversity exists, "the court would have no obligation, and maybe no authority, to remand the case" where removal was only proper based on a federal question which was subsequently removed from the case (emphasis added)). In any event, even if the Court has discretion to remand this case, the Court is satisfied that retaining jurisdiction is proper, given the several phases of briefing that have been presented in this Court and the recent consolidation of the two underlying cases. Given the amount of time and effort expended by the Court and the Parties, there is no reason to remand the case at this time. See Williams v. M/V Sonora, 985 F.2d 808, 812 (5th Cir. 1993).

## V. ASSIGNMENT OF CLAIMS TO PLAINTIFF FENIX FLASHLIGHTS

Finally, the Court notes that Defendants also argue that this case must be dismissed because the Assignment Agreement between Olight and Plaintiff did not confer standing on Plaintiff to bring this action. (Defs.' Br. [Doc. #6-4] at 18.) Specifically, Defendants contend that the assignment was not sufficient because it was not executed prior to Plaintiff filing the Complaint. (Id.)

In considering this contention, the Court notes first that Plaintiff is the assignee of Olight's "complete rights pertaining to the products that are the subject of [the] Complaint," and is therefore the real party in interest under Federal Rule of Civil Procedure 17(a). See Winn v. Amerititle, Inc., 731 F. Supp. 2d 1093, 1099 (D. Idaho 2010) (stating that "[m]odern interpretations of Rule 17(a) allow a real party in interest the ability to assign her rights in an action to a third party"); see also Infodek, Inc. v. Meredith-Webb Printing Co., 830 F. Supp. 614, 620 (N.D. Ga. 1993) (collecting cases supporting the proposition "that even when the claim is not assigned until after the action is instituted, the assignee is the real party in interest and can maintain the action."); Wright & Miller, Federal Practice & Procedure § 1545 (2010)).

Moreover, even if the Court accepted Defendants' contention that the claim must be assigned before the action is commenced, the assignment in this case was effective prior to Olight filing its Complaint in any event. The Assignment Agreement was executed by Olight on October 3, 2012, and by Plaintiff on October, 4, 2012, and purports to be effective as of September 1, 2012. (Fenix I, Chow Decl., Ex. 3 [Doc. #22-3].)[14] Plaintiff filed the Complaint

---

[14] Because Plaintiff filed the Complaint in Fenix II well after the assignment agreement was executed, this argument appears applicable only to Fenix I.

in Fenix I on October 3, 2012. Although Plaintiff did not sign the Agreement prior to filing suit, "[a] contract signed by one of the parties only, but accepted and acted on by the other party to it, may be just as binding as if it were signed by both parties, if the obligations of the parties are mutual." Gruber v. Wilner, 443 S.E.2d 673, 676 (Ga. Ct. App. 1994) (quotation marks omitted); see also Del Lago Ventures, Inc. v. QuikTrip Corp., 764 S.E.2d 595, 599 (Ga. Ct. App. 2014) (noting that "[a]ssent to the terms of a contract may be given other than by signatures" (internal quotation omitted)); Garcia v. Charles Evans BMW, Inc., 473 S.E.2d 588, 590 (Ga. Ct. App. 1996).[15] Here, the sole contemplation of the Assignment Agreement is Plaintiff's pursuance of the claims at issue in this action, and Plaintiff indeed filed this action on the same day that Olight executed the Assignment Agreement. The Assignment Agreement, although only signed by Olight at the time the Complaint was filed, was binding as if signed by both parties because Plaintiff had accepted and acted on it.[16] Thus, it appears that the assignment was effective as of the date Plaintiff filed the Complaint, and Defendants' Motion to Dismiss based on the date of the Assignment Agreement should be denied. [17]

---

[15] The Parties appear to agree that Georgia law applies here to determine the effective date of the assignment, based on the choice of law provision in the Assignment Agreement. The Court also notes that, in any event, under North Carolina law, the result would be the same as under Georgia law. See Benezra v. Zacks Inv. Research, Inc., No. 1:11CV596, 2012 WL 1067559, at *4 (M.D.N.C. Mar. 30, 2012).

[16] Defendants point to Outdoor Sys., Inc. v. Wood, 543 S.E.2d 414 (Ga. Ct. App. 2000), in arguing that the assignment did not adequately confer standing upon Plaintiff. In that case, however, the assignment was not specifically of claims, but of "right, title, and interest as lessee or tenant in and to [a] [l]ease." Id. at 417. On those facts, despite the assignment having a retroactive effective date, the court concluded the assignment was not effective to confer standing on the plaintiff as to its trespass claim because the assignment did not assign the cause of action itself. However, of note, with respect to the plaintiff's breach of lease agreement claim, the court found that the plaintiff had adequate standing, and noted that "the fact that the assignment is retroactive does not affect [the defendant's] rights. Rather, [the plaintiff] simply stands in the shoes of [the original lessee]." Id. at 418. Given that the primary cause of action at issue here is one for breach of contract, and that the assignment was specifically with respect to the claims at issue, even if the Court were to apply Outdoor Systems as Defendants urge, Plaintiff would have standing to pursue the assigned claims.

[17] Defendants further argue that Plaintiff's causes of action for fraudulent inducement and unfair and deceptive

29

VI.   CONCLUSION

For the reasons set out above, the Court will recommend that Defendants' Motion to Dismiss be denied, that Plaintiff's Motion to remand be denied, and that this matter proceed in this Court. The Court further notes that, if this Recommendation is adopted, this matter should be set for an initial pretrial conference. In addition, given the nature of the claims, the record already developed, and the extent of the proceedings thus far, the Court concludes that it would be appropriate to require the Parties to participate in a preliminary mediation, before the matter proceeds further on the merits. Therefore, the Court will Order that the Parties conduct a preliminary mediation, in compliance with Local Rule 83.9e, on or before June 1, 2016. The Clerk will select a mediator from the Court's panel of mediators, unless the Parties provide the name of an agreed-upon mediator on or before April 15, 2016.

IT IS THEREFORE RECOMMENDED that Defendants' Motion to Dismiss [Doc. #2] and Plaintiff's Motion to Remand [Doc. #13] be DENIED; that Defendants' Motion to Supplement Record (Fenix I, 1:12CV1310 [Doc. #66]; Fenix II, 1:15CV140 [Doc. #25]) and Plaintiff's Motion to Strike (Fenix I, 1:12CV1310 [Doc. #68]; Fenix II, 1:15CV140 [Doc. #27]) be DENIED as moot; and that Plaintiff's claims for fraudulent inducement and unfair and deceptive trade practices be dismissed without prejudice pursuant to Plaintiff's Notice of Voluntary Dismissal.

---

trade practices should be dismissed for lack of standing "because [those claims] are not assignable under North Carolina law." (Defs.' Br. [Doc. #6-4] at 19.) As previously noted, however, Plaintiff has filed a Notice of Voluntary Dismissal of those claims. (Fenix I, Pl.'s Notice of Voluntary Dismissal [Doc. #24]; Pl.'s Resp. [Doc. #6-5] at 20-21.) Despite Defendants' position that Plaintiff's "dismissal attempt was defective," (Defs.' Br. [Doc. #6-4] at 3), it appears to the Court that Plaintiff' Notice of Voluntary Dismissal was effective. To the extent any question remains, the Court will recommend that these claims be dismissed without prejudice pursuant to the Notice of Voluntary Dismissal.

IT IS ORDERED that the Parties conduct a preliminary mediation, in compliance with Local Rule 83.9e, on or before June 1, 2016, and the Clerk is directed to select a mediator from the Court's panel of mediators, unless the Parties provide the name of an agreed-upon mediator on or before April 15, 2016.

This, the 31st day of March, 2016.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge